Redacted/Cleared for Public Release

Filed with Classified
Information Security Officer
CISO _Mluterse_
Date  7/30/2020

No. 19-4385

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH COURT

### UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

### KEVIN PATRICK MALLORY,
*Defendant/Appellant.*

**On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. T. S. Ellis, III)**

### BRIEF OF THE APPELLANT

**GEREMY C. KAMENS**
**Federal Public Defender**

**Geremy C. Kamens**
**Federal Public Defender**
**Frances H. Pratt**
**Todd M. Richman**
**Assistant Federal Public Defenders**
**Counsel for Appellant**
**1650 King Street, Suite 500**
**Alexandria, VA 22314**
**(703) 600-0800**
**Geremy_Kamens@fd.org**
**Fran_Pratt@fd.org**
**Todd_Richman@fd.org**

Redacted/Cleared for Public Release

# TABLE OF CONTENTS

Table of Authorities ..................................................................................iv

Introduction ................................................................................................1

Statement of Jurisdiction............................................................................2

Statement of the Issues...............................................................................2

Statement of the Case.................................................................................4

    A.    Background .................................................................................5

    B.    Pretrial Rulings Regarding the Silent Witness Rule (SWR)..............10

    C.    Trial Ruling on SWR...............................................................12

    D.    Jury Instructions .....................................................................13

Summary of Argument .............................................................................14

Argument...................................................................................................19

I.    The District Court Erred in Applying the Silent Witness Rule to
    Preclude Reference in Open Court to Publicly Available Government
    Documents and Other Information in the Public Domain............................19

    A.    Review of the Denial of Fifth and Sixth Amendment Rights Is
        De Novo...................................................................................19

    B.    The District Court Violated Mr. Mallory's Right to a Public
        Trial ........................................................................................20

        1.    The Right to a Public Trial Is Critical to a Fair Trial ..............20

        2.    The District Court Violated Mr. Mallory's Right to a
            Public Trial by Excluding Publicly Available Documents
            and Information From the Public Trial, and by Failing to
            Make Specific Factual Findings to Support the Exclusion
            of Such Evidence From the Public Trial....................................23

Redacted/Cleared for Public Release

a.  Evidence Admitted With Respect to Whether the Transmitted Documents Contained NDI Was a Critical Issue in the Case ..............................................23

b.  The District Court Failed to Satisfy the Strict Standard to Support Excluding Publicly Available Documents From the Public Trial ...................................25

C.  Application of the SWR Impeded Mr. Mallory's Right to Present a Defense ..............................................................31

D.  The Court's Violation of Mr. Mallory's Right to a Public Trial and Right to Present His Defense Requires a New Trial ....................36

II.  The District Court Erred in Instructing the Jury as to the Mens Rea Element of 18 U.S.C. § 794 ..............................................................37

A.  Standard of Review ..........................................................................37

B.  The District Court Applied a Negligence Standard to the "Delimiting" Clause of § 794(a), and Lowered the Subjective Intent Standard to "Wilfullness" ..........................................................37

1.  Section 794's Intent Element Requires Proof of Subjective Intent or Reason to Believe That Disclosure Will Harm the United States or Will Be Used to the Advantage of a Foreign Nation ...................................38

2.  The District Court Charged the Jury That the "Reason to Believe" Element Could Be Established Based Upon a Reasonable Person Standard .......................................................40

3.  The District Court's Addition of a "Willfulness" Element, and Denying That the Reasonable Person Standard Is Equivalent to Negligence, Does Not Cure the Error ...................................................................................41

C.  The Court Must Vacate the Conviction on Count 1 and Remand for a New Trial ................................................................................45

III.   The District Court Erred by Refusing to Instruct the Jury as to the
       Defense's Theory of Defense Instruction That Evidence of Selling and
       Buying Contraband Is Not Sufficient to Establish a Criminal
       Conspiracy ................................................................................................46

       A.   Standard of Review ...........................................................................46

       B.   Based Upon the Evidence Introduced at Trial, the District Court
            Erred in Refusing to Instruct the Jury that Evidence of a Buyer-
            Seller Relationship Is Insufficient to Establish a Conspiracy .............47

Conclusion ................................................................................................53

Request for Oral Argument...............................................................................54

Certificate of Compliance

Redacted/Cleared for Public Release

## TABLE OF AUTHORITIES

### Cases

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)...................................45

*Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000) ...................................................... 21, 22

*BMG Rights Mgmt. (US) LLC v. Cox Comm., Inc.*, 881 F.3d 293 (4th Cir. 2018) ................................................................................................................ 41, 43

*Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618 (4th Cir. 2008).............................39

*Crane v. Kentucky*, 476 U.S. 683 (1986) ................................................................16

*Elonis v. United States*, 135 S. Ct. 2001 (2015) .......................................... 38, 40, 42

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) .................................................39

*Estes v. Texas*, 381 U.S. 532 (1965) .......................................................................20

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979)...................................................22

*Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596 (1982)..................................................................................................................20

*Gorin v. United States*, 312 U.S. 19 (1941).................................... 15, 16, 17, 23, 38

*Holmes v. South Carolina*, 547 U.S. 319 (2006) .....................................................14

*In re Oliver*, 333 U.S. 257 (1948)...........................................................................20

*Ingram v. United States*, 360 U.S. 672 (1959)...........................................................38

*Judd v. Haley*, 250 F.3d 1308 (11th Cir. 2001) .......................................................23

*Kansas v. Hendricks*, 117 S. Ct. 2072 (1997)...........................................................39

*Mathews v. United States*, 485 U.S. 58 (1988)................................................... 46, 47

*Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981).............................13

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

*Presley v. Georgia*, 558 U.S. 209 (2010)............................................................. 21, 22

*Press-Enterprise Co. v. Superior Court of California, Riverside Cty.*, 464
U.S. 501 (1984)........................................................................................... 21, 22, 30

*Salinas v. United States*, 522 U.S. 52 (1997).............................................................48

*Staples v. United States*, 511 U.S. 600 (1994)...........................................................40

*Taylor v. Illinois*, 484 U.S. 400 (1988) ......................................................................31

*United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) .................................. 3, 24, 26

*United States v. Addison*, 708 F.3d 1181 (10th Cir. 2013).......................................20

*United States v. Brown*, 726 F.3d 993 (7th Cir. 2013) ..............................................49

*United States v. Candelario-Santana*, 834 F.3d 8 (1st Cir. 2016)............................23

*United States v. Diaz*, 69 M.J. 127 (C.A.A.F. 2010)................................................43

*United States v. Doe*, 962 F.3d 139 (4th Cir. 2020) ..................................................21

*United States v. Dornhofer*, 859 F.2d 1195 (4th Cir. 1988).............................. 19, 47

*United States v. Featherston*, 461 F.2d 1119 (5th Cir. 1972)...................................39

*United States v. Fernandez*, 913 F.2d 148 (4th Cir. 1990)............... 3, 26, 31, 32, 36

*United States v. Gee*, 226 F.3d 885 (7th Cir. 2000)..................................... 48, 50, 52

*United States v. Gresko*, 632 F.2d 1128 (4th Cir. 1980) ...........................................45

*United States v. Hackley*, 662 F.3d 671 (4th Cir. 2011)...........................................50

*United States v. Harris*, 65 F.3d 177, 1995 WL 497915 (9th Cir. Aug. 16,
1995) ...........................................................................................................................52

*United States v. Hassouneh*, 199 F.3d 175 (4th Cir. 2000) ......................................45

*United States v. Howard*, 773 F.3d 519 (4th Cir. 2014)...........................................48

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

*United States v. Iron Eyes*, 367 F.3d 781 (8th Cir. 2004)..........................................39

*United States v. Kiriakou*, 898 F. Supp. 2d 921 (E.D. Va. 2012)............................44

*United States v. Kissel*, 218 U.S. 601 (1910)..............................................................48

*United States v. Lechuga*, 994 F.2d 346 (7th Cir. 1993)...........................................48

*United States v. Lewis*, 53 F.3d 29 (4th Cir. 1995).....................................................50

*United States v. Lomax*, 816 F.3d 468 (7th Cir. 2016)..............................................46

*United States v. Miller*, 658 F.2d 235 (4th Cir. 1981)...............................................47

*United States v. Mitchell*, 495 F.2d 285 (4th Cir. 1974)............................................47

*United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988).......................... 15, 38, 43

*United States v. Mouzone*, 687 F.3d 207 (4th Cir. 2012).........................................37

*United States v. Munguia*, 704 F.3d 596 (9th Cir. 2012)...........................................39

*United States v. Parker*, 554 F.3d 230 (2d Cir. 2009)...............................................49

*United States v. Prieskorn*, 658 F.2d 631 (8th Cir. 1981).........................................52

*United States v. Rahman*, 83 F.3d 89 (4th Cir. 1996)................................................37

*United States v. Rewald*, 889 F.2d 836 (9th Cir. 1989)............................................13

*United States v. Richardson*, 33 M.J. 127 (C.M.A. 1991).........................................45

*United States v. Ricks*, 573 F.3d 198 (4th Cir. 2009)................................................46

*United States v. Rosen*, 487 F. Supp. 2d 703 (E.D. Va. 2007)......................... *passim*

*United States v. Rosen*, 520 F. Supp. 2d 786 (E.D. Va. 2007)................................25

*United States v. Saffo*, 227 F.3d 1260 (10th Cir. 2000)............................................39

*United States v. Savage*, 885 F.3d 212 (4th Cir. 2018)............................................46

*United States v. Simmons*, 797 F.3d 409 (6th Cir. 2015).................................. 22, 25

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

*United States v. Smith*, 780 F.2d 1102 (4th Cir. 1985)................................................4

*United States v. Smith*, 960 F.3d 883 (6th Cir. 2020)................................................39

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000).............................. 15, 23

*United States v. Thomas*, 150 F.3d 743 (7th Cir. 1998) ...........................................52

*United States v. Thomas*, 284 F.3d 746 (7th Cir. 2002) ...........................................52

*United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980) ................ *passim*

*United States v. Varner*, 748 F.2d 925 (4th Cir. 1984).............................................45

*United States v. Zettl*, 835 F.2d 1059 (4th Cir. 1987).................................... 3, 24, 27

*Waller v. Georgia*, 467 U.S. 39 (1984)................................................. 20, 21, 22, 36

*Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) ..................................... 16, 22, 36

## Constitutional Provisions, Statutes, and Rules

U.S. Const. amend. V................................................................................. 1, 3, 14, 19

U.S. Const. amend. VI .......................................................................................*passim*

10 U.S.C. § 431 ..................................................................................................13

18 U.S.C. § 1001 ........................................................................................... 1, 4, 10

18 U.S.C. § 3231 ..................................................................................................2

18 U.S.C. § 793(d) ..............................................................................................43

18 U.S.C. § 793(e) ..........................................................................................38, 43

18 U.S.C. § 794................................................................................................*passim*

28 U.S.C. § 1291 ..................................................................................................2

50 U.S.C. § 3523 ................................................................................................13

Classified Information Procedures Act (CIPA) § 6..................................................26

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

Classified Information Procedures Act (CIPA) § 8 ............................................. 12, 26

Fed. R. App. P. 4 ....................................................................................................... 2

## Treatises

3 W. Lafave, Subst. Crim. L. (3d ed. 2018) ............................................................ 41

viii

Redacted/Cleared for Public Release

No. 19-4385

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

KEVIN PATRICK MALLORY,
*Defendant/Appellant*.

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. T. S. Ellis, III)

BRIEF OF THE APPELLANT

## INTRODUCTION

Kevin Mallory was convicted following a jury trial of conspiring to commit
espionage in violation of 18 U.S.C. § 794(c), and making false statements in
violation of 18 U.S.C. § 1001. The district court made three critical errors that
deprived Mr. Mallory of a fair trial and require a new one.

First, the court violated his Sixth Amendment right to a public trial – thereby
committing a structural error – and his Fifth and Sixth Amendment rights to
present a defense by applying the "Silent Witness Rule" to prevent the disclosure

1

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

in open court of publicly-available documents and information. Second, the court

reduced the significant mens rea element required to establish a violation of § 794

by instructing the jury that the "with intent or reason to believe" element could be

met by an objective "reasonable person" standard. Third, the court refused to

instruct the jury on the buyer-seller theory of defense. This Court should vacate

Mr. Mallory's convictions and remand for a new trial.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case pursuant to 18 U.S.C.

§ 3231. The judgment was entered on May 17, 2019. U.J.A. 1820. Mr. Mallory

timely filed his notice of appeal on May 31, 2019. U.J.A. 1830; *see* Fed. R. App.

P. 4(a)(1). Therefore, this Court has jurisdiction over this appeal pursuant to 28

U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    The "Silent Witness Rule" (SWR) is a method used by several courts

to permit juries, trial courts, and parties to have access to classified documents

introduced as evidence at trial, but that otherwise does not:

> disclose information from the classified document in open court.
> Instead, the witness would have a copy of the classified document
> before him. The court, counsel and the jury would also have copies of
> the classified document. The witness would refer to specific places in
> the document in response to questioning. The jury would then refer to
> the particular part of the document as the witness answered. By this
> method, the classified information would not be made public at trial

2

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

but the defense would be able to present that classified information to the jury.

*United States v. Zettl*, 835 F.2d 1059, 1063 (4th Cir. 1987). The SWR thus implicates the right to a public trial, the violation of which constitutes a structural error.

Without making specific findings as to the need to prevent public access to the documents themselves, the district court ordered that no public reference could be made at trial with respect to publicly available documents – most of which were public unclassified government publications – introduced to demonstrate that information transmitted by Mr. Mallory did not constitute national defense information (NDI). C.J.A. 213-24. This appears to be the first time that the SWR has been applied to publicly-available documents.[1] Did the district court's ruling violate Mr. Mallory's Sixth Amendment right to a public trial and Fifth and Sixth Amendment rights to present a complete defense?

II.    "Under [18 U.S.C. §] 794(a) and [§] 794(c), the prosecution must prove that the defendant acted 'with intent or reason to believe' that transmission of the information will injure the United States or aid a foreign nation." *United States v. Truong Dinh Hung*, 629 F.2d 908, 918 (4th Cir. 1980); *see also United*

---

[1] This Court has discussed the application of the Silent Witness Rule to classified information in *United States v. Abu Ali*, 528 F.3d 210, 255 (4th Cir. 2008), *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990), and *United States v. Zettl*, 835 F.2d 1059, 1063 (4th Cir. 1987).

3

Redacted/Cleared for Public Release

*States v. Smith*, 780 F.2d 1102, 1104 n.2 (4th Cir. 1985). Did the court commit error by instructing the jury that it could convict the defendant as long as a "reasonable person" should have known that transmitted information would be used to the injury of the United States or the advantage of a foreign country, as long as the defendant transmitted the information "willfully"?

III.    With respect to the conspiracy to commit espionage, substantial evidence was presented at trial that the defendant had a transactional, arms-length relationship with a Chinese agent, and that he provided information about his contacts with the foreign agent to the CIA and FBI unbeknownst to the foreign agent. Did the district court err in failing to instruct the jury that proof of a buyer-seller relationship, without more, is insufficient to establish a criminal conspiracy?

## STATEMENT OF THE CASE

Kevin Mallory, an Army veteran and former employee of the CIA and DIA, was convicted at trial of conspiring to deliver national defense information to a Chinese intelligence agent in violation of 18 U.S.C. § 794(c), and making material false statements in an interview with FBI agents in violation of 18 U.S.C. § 1001. He was acquitted, following post-trial motions, of two counts alleging espionage and attempted espionage in violation of § 794(a).

4

Redacted/Cleared for Public Release

A.    Background

After serving in the U.S. military, Mr. Mallory spent twenty years working as a case officer for the Central Intelligence Agency, a CIA contractor, an employee of several defense contracting companies – including in zones of armed conflict in Iraq – and as an intelligence officer for the Defense Intelligence Agency. *See* U.J.A. 140, 159, 256-65, 1186, 1193.

The case began on February 9, 2017, when Mr. Mallory responded to an unsolicited message on a professional networking site, LinkedIn. U.J.A. 508. At the time, Mr. Mallory faced financial difficulties, and had not made his mortgage payments in December 2016 and January 2017. U.J.A. 503. The contact purported to be on behalf of Michael Yang, an employee of a Chinese think tank, the Shanghai Academy of Social Sciences (SASS). Mr. Mallory expressed interest, and participated in a video interview. U.J.A. 517-18.

Concerned that his contact might be associated with Chinese intelligence, on February 22, 2017, Mr. Mallory approached an acquaintance who worked at the CIA to see if he could speak with someone at the Agency responsible for East Asian or Chinese operations. U.J.A. 175, 186. Rebuffed, he reached out to a second person, a former colleague who still worked at the CIA. U.J.A. 227-29, 237-43. The colleague testified that Mr. Mallory seemed interested in returning to work at the CIA. U.J.A. 240. But Mr. Mallory also continued to seek a meeting at

5

Redacted/Cleared for Public Release

the CIA regarding his contact with potential Chinese intelligence agents. U.J.A. 241-47.

Nonetheless, in the absence of guidance from the CIA, and at the invitation of the Chinese contact, Michael Yang, Mr. Mallory traveled to China on two occasions in March and April 2017. U.J.A. 272, 521, 558. For the first trip, from March 11 through March 19, Mr. Mallory stated he expected payment of $10,000 plus expenses. U.J.A. 274. The second trip took place between April 14 and April 21, and Mr. Mallory returned with $16,500. U.J.A. 205-07. According to Mr. Mallory, the Chinese sought out information about U.S. foreign policy regarding the South China Sea, Chinese currency manipulation, and the implementation of a missile defense system in South Korea. U.J.A. 292-93.

No evidence was introduced at trial that Mr. Mallory provided classified information on either trip. Nonetheless, he received a Samsung Galaxy cell phone from Mr. Yang that contained a custom application designed to allow confidential communications and the concealed transmission of documents between that phone and a corresponding phone with the same application. U.J.A. 297.

On April 24, 2017, Mr. Mallory sent a text message to his former CIA colleague that stated, "Could you please go back to your security POC ... [I] recently returned from another business trip over there and was again approached in a manner from their service ... would like to discuss with [someone] over at HQ

6

Redacted/Cleared for Public Release

what is going on. Please feel free to pass them my name and telephone number with my request for someone to contact me so I can get this on the record ...." U.J.A. 228-29, 1839-40.

On April 25, Mr. Mallory went to a FedEx store in Leesburg, Virginia, and scanned approximately 45 pages onto digital media, some of which constituted classified documents. U.J.A. 573, 649, 661.

On April 26, at 9:39 a.m., Mr. Mallory left a voicemail with his former CIA colleague that said: "I sent you a text message a couple of days ago. Please look at the message. If you could let the guy in there know, accordingly. It's kind of urgent for me, 'cause I've been over there again, and I keep getting banged on, but in a little bit more detailed way. So, appreciate if you could pass it on. Please let me know you got the message. My cell number is in there. You can just text me." U.J.A. 344-45, 1834.

After receiving no response that day, at 9:18 p.m. on April 26, Mr. Mallory sent a text message stating: "I know you're busy with work ... As I told you in the past I suspected who they are and didn't really know but this time they were even more suspicious with me and, even asked me a couple questions that only [someone] in this industry would know ... You have my number please feel free to let them know that one this is obviously someone from their counterpart to us." U.J.A. 233, 247, 1843-45.

7

Redacted/Cleared for Public Release

On April 29, the contact finally responded by saying, "Hi Kevin, I finally passed your request yesterday to my office colleague who passed on to the other office." U.J.A. 247, 1846.

On May 1, 2017, Mr. Mallory used the cell phone with the custom application to send (1) a one-page document titled "Table of Contents," U.J.A. 1849, C.J.A. 417; (2) a one-page document entitled "White Paper," U.J.A. 1851, C.J.A. 419; and (3) two pages of unclassified handwritten notes, U.J.A. 1852-53 (collectively, the "Transmitted Documents") to Michael Yang.  U.J.A. 833-35, 1210.

The handwritten "Table of Contents" listed eight document titles, including "S&T Targeting Opportunity,"                                    "FISA," and "      Capabilities." C.J.A. 417. The "White Paper" purported to be an undated proposal for an intelligence operation with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ C.J.A. 419.  The operation would be ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The "White Paper" also listed intelligence interests ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

████████████████████████████████████████

████████████ C.J.A. 419.

The "White Paper" was drawn from a government document created by Mr. Mallory when he was employed at the DIA approximately a decade before. U.J.A. 1037-38. But all of the specific identifying information in the DIA document was stripped out of the "White Paper." U.J.A. 1042-43. Moreover, Mr. Mallory's proposal was never in operation while he was employed there. U.J.A. 1039.

On May 2, a CIA employee, Michael Dorsey, had two telephone calls with Mr. Mallory, U.J.A. 285-86, and Mr. Mallory texted his ex-CIA colleague, "Finally made contact." U.J.A. 234, 1847. Mr. Mallory had surgery the first week of May, U.J.A. 271, 286, and then spoke with Mr. Dorsey on May 11 to schedule a meeting for the following day. U.J.A. 286.

On May 12, Mr. Mallory met Mr. Dorsey at CIA headquarters to discuss his contacts with Chinese intelligence. U.J.A. 272-76. Mr. Mallory was interviewed for four hours, U.J.A. 290, and he disclosed that he had received a phone from the Chinese contacts. U.J.A. 287, 297. He also described how the custom application worked, and how documents could be transmitted while embedded within a picture file. U.J.A. 297-98. He also agreed to bring the phone to a subsequent meeting, and said that he had sent a "test message" using the "secure" mode of the custom application on the phone. U.J.A. 303, 1838. But he did not specifically reveal that

9

he had sent the Transmitted Documents on May 1, or that he had retained other classified government documents that had not been sent.

Mr. Mallory had subsequent calls with Mr. Dorsey to schedule a follow-up meeting on May 24, when he met with FBI agents. U.J.A. 288-89. At that meeting, Mr. Mallory "wanted to demonstrate" how the communication application worked, U.J.A. 323, 358, provided the phone that contained the custom application for the FBI to make an image, and provided instructions about how to use the custom application. U.J.A. 323-24, 359-60. Without Mr. Mallory's assistance, the FBI forensic examiner testified he would not have been able to access the application. U.J.A. 359-62.

On June 22, 2017, Mr. Mallory was arrested, and copies of the Transmitted Documents as well as six other classified government documents were found on digital media at his home. Mr. Mallory was subsequently charged by indictment with: (1) conspiring to commit espionage in violation of 18 U.S.C. § 794(c); (2) espionage in violation of § 794(a); (3) attempted espionage in violation of § 794(a); and (4) false statements in violation of 18 U.S.C. § 1001. U.J.A. 26-44.

B.    Pretrial Rulings Regarding the Silent Witness Rule (SWR)

During the course of pre-trial Classified Information Procedures Act (CIPA) hearings, the government requested that the district court admit classified information subject to the Silent Witness Rule. C.J.A. 9-12, 25-28. The defense

10

objected that application of the SWR would violate Mr. Mallory's right to a public trial and impair his ability to present his defense. C.J.A. 49-51.[2]  The district court overruled the defense objection and ruled that the SWR would be applied to all of the classified documents admitted into evidence.  C.J.A. 69-72.  However, the court also ruled that the defense would be allowed to use publicly available materials to challenge the government's claim that the information in the classified documents constituted NDI.  Noting that "the SWR may infringe on 'a defendant's Sixth Amendment right to a public trial,'" the court stated that "[t]he government recommends use of the SWR only with respect to a limited number of classified documents," and that "defendant will be given latitude to cross-examine witnesses using items in the public record to show that the information contained in the documents is widely known and not a closely-held government secret."  C.J.A. 71-72.

The defense moved to reconsider the ruling solely with respect to the Transmitted Documents, again arguing that the SWR violated the right to a public trial and to present a defense.  C.J.A. 77-85.  In response, the government argued not only that all classified documents should be subject to the SWR, but also that public source documents relevant to the NDI element be referred to by "cover

---

[2] Originally, the government believed that Mr. Mallory transmitted to the Chinese agent the Table of Contents, the White Paper, and six pages of "Document 2." Shortly before trial, the government advised that it did not have evidence of the transmission of "Document 2." C.J.A. 103 n.1.

11

Redacted/Cleared for Public Release

terms." C.J.A. 97-98. The court denied both the motion to reconsider and the government's request, reiterating that "the defense will be permitted to use documents available in the public record to question witnesses regarding whether the classified information in question is national defense information without resorting to the silent witness rule." C.J.A. 109-10.

C.    Trial Ruling on SWR

In accordance with the court's pretrial ruling, the defense collected a large number of publicly-available documents for use in cross-examination of a government's expert on the issue of whether the Transmitted Documents contained NDI. Prior to the cross examination of its witness, the government objected to the use of the public source documents pursuant to CIPA § 8, which provides that "[d]uring the examination of a witness in any criminal proceeding, the United States may object to any question or line of inquiry that may require the witness to disclose classified information not previously found to be admissible." U.J.A. 1011.

At the bench conference, the government argued that it had received a "binder of open source material," and that "reading this into the public record is to drop parallels between those open source documents and the words [in classified documents] [the witness] could not say out loud in court." C.J.A. 213, 215. "The minute you start lining them up with the jury, with the classified information," the

12

Redacted/Cleared for Public Release

government argued, "those [public source materials] become classified facts."

C.J.A. 215. Specifically, the government argued that



C.J.A. 218-19.[3] The district court then reversed its pretrial

ruling and ordered that all public source documents related to the NDI element

would be subject to the SWR. C.J.A. 222-27.

### D. Jury Instructions

Mr. Mallory submitted a jury instruction specifying that "[p]roof of a buyer-seller relationship is insufficient to prove a conspiracy to communicate, deliver, or transmit information relating to the national defense." U.J.A. 89. The defense also



13

Redacted/Cleared for Public Release

maintained that the intent element in § 794 required proof of subjective intent, while the government argued for an objective standard. U.J.A. 1267-69.

The day before closing arguments, the district court heard argument and concluded that the government "cannot win a conviction simply on an objective standard." U.J.A. 1279. The next day, however, the government filed a motion to reconsider the court's June 6 ruling as to the mens rea requirement. U.J.A. 1286. The court then reversed its prior decision, and agreed that the "intent or reason to believe" element could be established objectively, but that the government must also prove that the defendant acted "willfully." U.J.A. 1346-57. The court declined to give Mr. Mallory's proposed instruction that a buyer-seller relationship is insufficient to establish a conspiracy. U.J.A. 1254-57.

Mr. Mallory was convicted of conspiring to commit espionage and making false statements, and sentenced to 20 years in prison.

## SUMMARY OF ARGUMENT

I.    Right to a Public Trial and to Present a Defense: The Sixth Amendment guarantees that in "all criminal prosecutions, the accused shall enjoy the right to a ... public trial." U.S. Const. Amend. VI. The Fifth and Sixth Amendments also guarantee "criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citation omitted). In this case, however, these rights were denied with respect to crucial

14

Redacted/Cleared for Public Release

evidence and testimony relating to whether information transmitted to a foreign agent constituted "national defense information," or NDI.[4]

Pursuant to 18 U.S.C. § 794, the transmission of NDI to a foreign agent, with the intent or reason to believe that the information is to be used to the injury of the United States or to the advantage of a foreign nation, is punishable by any term of years or, in circumstances not present here, death. But no crime occurs if the information is not NDI. In other words, transmitting information that the government has made publicly available (or conspiring to do so) does not violate the statute. *See Gorin v. United States*, 312 U.S. 19, 28 (1941). To determine whether information constitutes NDI, "the central issue is the secrecy of the information." *United States v. Squillacote*, 221 F.3d 542, 577 (4th Cir. 2000). And the typical way "to rebut the government's claim that certain material is NDI [is] by having witnesses compare the alleged NDI to contemporaneous public domain material." *See United States v. Rosen*, 487 F. Supp. 2d 703, 711 (E.D. Va. 2007).

In this case – apparently for the first time in any trial – the district court prohibited the defense from adducing evidence and questioning witnesses in open

_____

[4] NDI is defined as information "which 'directly or may reasonably be connected with the defense of the United States,' the disclosure of which 'would be potentially damaging to the United States or might be useful to an enemy of the United States' and which ha[s] been 'closely held' by the government and was 'not available to the general public.'" *United States v. Morison*, 844 F.2d 1057, 1076 (4th Cir. 1988).

15

court as to *publicly available government documents* and other materials designed to establish that the transmitted information was not NDI. It did so by applying the Silent Witness Rule, not only with respect to classified documents and information, but also with respect to *unclassified documents and information*. It also failed to make any of the specific findings necessary before authorizing the wholesale exclusion of such testimony and evidence from a public trial. By applying the Silent Witness Rule to bar the defendant from discussing publicly available materials in open court, the district court committed a structural error that "entitl[es] the defendant to automatic reversal without any inquiry into prejudice." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1905 (2017). It also violated Mr. Mallory's right to a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).

II.    Mens Rea for 18 U.S.C. § 794: Section 794 contains "strong scienter language." *United States v. Truong Dinh Hung*, 629 F.2d 908, 919 (4th Cir. 1980). Specifically, the statute requires proof that a defendant acted "with intent or reason to believe that [the information disclosed] is to be used to the injury of the United States or to the advantage of a foreign nation." 18 U.S.C. § 794(a).

As the Supreme Court has explained, this language "requires those prosecuted to have acted in bad faith." *Gorin*, 312 U.S. at 27-28. This Court has also stated that "[t]his scienter requirement is critically important, because the

16

Redacted/Cleared for Public Release

Supreme Court relied upon it in *Gorin*, 312 U.S. at 26-27 (1941), to rebut a claim that the espionage statutes were unconstitutionally overbroad." *Truong Dinh Hung*, 629 F.2d at 918. Conviction for committing espionage under § 794 thus requires proof that the defendant actually intended or had reason to believe that information transmitted to a foreign agent would be used to harm the United States or aid a foreign country, rather than proof that a reasonable person would have concluded as much.

At the trial in this case, however, the district court watered down the mens rea element of § 794 and instructed the jury that it could find Mr. Mallory guilty based upon an objective, rather than subjective, determination as to whether information would be used to harm the United States or aid another country, as long as the defendant acted "willfully" in transmitting the information. U.J.A. 1459-60. Specifically, with respect to whether information would be used to harm the United States or aid a foreign country, the court instructed the jury that "the question is whether a reasonable person in the defendant's position would have reached the same conclusion." U.J.A. 1459. This was error.

III.    Theory of Defense Instruction: Finally, the district court refused to instruct the jury as to Mr. Mallory's theory of defense that his contacts with a foreign agent were entirely at arms-length, and merely between a seller (Mr. Mallory) seeking money and counterintelligence, and a wary buyer (a Chinese

17

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

agent), rather than as partners in a conspiracy. Significant evidence adduced at trial supported this theory of defense, in part because Mr. Malloy transmitted hand-made documents devoid of significant intelligence value rather than actual classified government documents, and provided information to the CIA and FBI about his Chinese contacts, but hid that fact from his alleged co-conspirators.

As the evidence established at trial, although Mr. Mallory had access to documents classified as top secret, and ample opportunity to send such documents to a Chinese agent, he instead sent: (1) a handwritten list of eight items entitled "Table of Contents," U.J.A. 1849, which a defense expert testified would not "cause damage to national security" if released, U.J.A. 1124; (2) a one-page document Mr. Mallory fabricated to appear like a classified document, with fake classification markings that had been marked out, U.J.A. 818-19, 1036, 1851, that the defense expert also testified posed no harm to national security from its transmission, U.J.A. 1155, 1164-66; and (3) two unclassified pages of handwritten notes.  U.J.A. 819, 1852-53 (the Transmitted Documents).  Mr. Mallory also repeatedly lied to the foreign agent about who he was, his access to information, and the information he sent, U.J.A. 812-19, but obtained valuable intelligence that he willingly turned over to the United States, repeatedly failed to send actual classified documents that he had retained from his previous employment by two

18

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

intelligence agencies, and stripped away all significant information from the two now-classified documents that he did transmit.

In light of this evidence, the district court erred by refusing to instruct the jury regarding this theory of the defense. *See United States v. Dornhofer*, 859 F.2d 1195, 1199 (4th Cir. 1988) (noting that theory of defense instructions that "have an evidentiary foundation and are accurate statements of the law" should be given). Specifically, the court should have instructed the jury that evidence of an agreement to buy or sell contraband, alone, is insufficient to establish the existence of a criminal conspiracy absent a showing that the alleged conspirators share a mutual stake in a common criminal objective apart from the transmission of contraband itself.

## **ARGUMENT**

I.  THE DISTRICT COURT ERRED IN APPLYING THE SILENT
    WITNESS RULE TO PRECLUDE REFERENCE IN OPEN COURT
    TO PUBLICLY AVAILABLE GOVERNMENT DOCUMENTS
    AND OTHER INFORMATION IN THE PUBLIC DOMAIN

A.  Review of the Denial of Fifth and Sixth Amendment Rights Is
    De Novo

This Court reviews de novo whether a district court violated a defendant's Sixth Amendment right to a public trial and Fifth and Sixth Amendment rights to present a complete defense. *See United States v. Hornsby*, 666 F.3d 296, 309 (4th Cir. 2012) (alleged violation of Fifth and Sixth Amendment rights reviewed de

19

Redacted/Cleared for Public Release

novo); *United States v. Laureano-Pérez*, 797 F.3d 45, 76 (1st Cir. 2015) (denial of public trial right reviewed de novo); *United States v. Addison*, 708 F.3d 1181, 1186 (10th Cir. 2013) (same).

### B.    The District Court Violated Mr. Mallory's Right to a Public Trial

#### 1.    The Right to a Public Trial Is Critical to a Fair Trial

The Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... public trial," is a central feature of our criminal justice system. *In re Oliver*, 333 U.S. 257, 266-68 (1948). "History had proven that secret tribunals were effective instruments of oppression," and therefore "the requirement of a public trial was to guarantee that the accused would be fairly dealt with and not unjustly condemned." *Estes v. Texas*, 381 U.S. 532, 538-39 (1965). The right was included in Pennsylvania's constitution as early as 1776, and similar provisions were included in the constitutions of most if not all of the other original states. *In re Oliver*, 333 U.S. at 268. As such, "'[a]t the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open.' And since that time, the presumption of openness has remained secure." *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 605 (1982) (citation omitted).

To be sure, the right to a public criminal trial is not absolute. *Waller v. Georgia*, 467 U.S. 39, 45 (1984). Nonetheless, in light of the lengthy historical

20

Redacted/Cleared for Public Release

tradition and practice of requiring criminal trials to be open to the public, the Supreme Court has stated that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Presley v. Georgia*, 558 U.S. 209, 215 (2010). It has also made clear that circumstances in which the "right to an open trial may give way ... to other rights or interests, such as the defendant's right to a fair trial *or the government's interest in inhibiting the disclosure of sensitive information* ... will be rare, ... and the balance of interests must be struck with special care." *Waller*, 467 U.S. at 45 (emphasis added).

The right to a public criminal trial can be overcome only when:

(1) the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced,

(2) the closure is no broader than necessary to protect that interest,

(3) reasonable alternatives to closing the proceeding are considered by the trial court, and

(4) findings adequate to support the closure are made by the trial court.

*Bell v. Jarvis*, 236 F.3d 149, 166 (4th Cir. 2000) (citing *Waller*, 467 U.S. at 48); *see also Presley*, 558 U.S. at 213-14.[5] Accordingly, "[t]hough these cases should

---

[5] This test is derived from the First Amendment right of access discussed in *Press-Enterprise Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501, 510 (1984); *cf. United States v. Doe*, 962 F.3d 139 (4th Cir. 2020) (applying First Amendment test from *Press-Enterprise* to motion to seal judicial order).

As the Supreme Court stated in *Presley*, "[t]he extent to which the First and Sixth Amendment public trial rights are coextensive is an open question." 558

21

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

be rare, a judge may deprive a defendant of his right to an open courtroom by making proper factual findings in support of the decision to do so." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1909 (2017). "A public-trial violation can occur, [however], as it did in *Presley*, simply because the trial court omits to make the proper findings before closing the courtroom, even if those findings might have been fully supported by the evidence." *Id.*

"The violation of the constitutional right to a public trial is a structural error, not subject to harmless error analysis." *Bell*, 236 F.3d at 165; *accord Weaver*, 137 S. Ct. at 1908 ("a violation of the right to a public trial is a structural error."). The finding of a violation thus requires the Court to vacate the judgment of conviction and remand the case for a new trial. *See United States v. Simmons*, 797 F.3d 409, 416 (6th Cir. 2015) (finding violation because of exclusion of three co-defendants from trial, and "because such a violation constitutes a structural error, we vacate

---

U.S. at 213. This Court need not address that difference here because the district court failed to meet the *Press-Enterprise* test described in *Bell*, *Waller*, and *Presley*, and "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Waller*, 467 U.S. at 46.

That said, the Sixth Amendment right to a public trial is stronger than the First Amendment right because it is a right "personal to the accused," *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979), grounded in the text of the Sixth Amendment, and not only "protects the rights of the public at large, and the press," but also protects "the defendant against unjust conviction." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017). As such, the exclusion of evidence or testimony from public view at a criminal trial should meet an even more stringent test than that derived from the implicit First Amendment public right of access to judicial proceedings generally.

22

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

the judgment of conviction and remand this case for a new trial."); *United States v. Candelario-Santana*, 834 F.3d 8, 22 (1st Cir. 2016) ("The mere demonstration that [a defendant's] right to a public trial was violated entitles a petitioner to relief.") (citation omitted); *Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001) ("[O]nce a petitioner demonstrates a violation of his Sixth Amendment right to a public trial, he need not show that the violation prejudiced him in any way. The mere demonstration that his right to a public trial was violated entitles a petitioner to relief.").

> 2.  <u>The District Court Violated Mr. Mallory's Right to a Public Trial by Excluding Publicly Available Documents and Information From the Public Trial, and by Failing to Make Specific Factual Findings to Support the Exclusion of Such Evidence From the Public Trial</u>
>
>> a.  <u>Evidence Admitted With Respect to Whether the Transmitted Documents Contained NDI Was a Critical Issue in the Case</u>

The transmission of *publicly-available information* to a foreign nation does "not fall within the statutory prohibitions" in § 794 because, given its public availability, it is not NDI. *United States v. Squillacote*, 221 F.3d 542, 579 (4th Cir. 2000). Likewise, as the Supreme Court noted in *Gorin*, "[w]here there is no occasion for secrecy, as with [government] reports relating to national defense, published by authority of Congress or the military departments, there can, of course, in all likelihood be no reasonable intent to give an advantage to a foreign

Redacted/Cleared for Public Release

government." 312 U.S. at 28. Accordingly, the question of whether information disclosed to a foreign nation is already in the public sphere, and, in particular, has already been publicly released by the government, is a critical issue in an espionage case.

So too in this one. The parties vigorously disputed whether the information in the Transmitted Documents was already in the public domain by virtue of official government-disclosed documents. The defense therefore sought "to rebut the government's claim that certain material is NDI by having witnesses compare the alleged NDI to contemporaneous public domain material." *United States v. Rosen*, 487 F. Supp. 2d 703, 711 (E.D. Va. 2007).

Under "the 'silent witness' procedure," however, "the jury is provided classified information that is withheld from the public ...." *United States v. Abu Ali*, 528 F.3d 210, 255 (4th Cir. 2008); *accord United States v. Zettl*, 835 F.2d 1059, 1063 (4th Cir. 1987) ("Under such a rule, the witness would not disclose the information from the classified document in open court."). The district court's application of the SWR to both classified and public-source materials in this case thus closed the trial with respect to a substantial and significant portion of the trial evidence. "What the public [did] not see or hear [was] the heart of the case, namely the classified material the government claims [was] the NDI that the defendant[] allegedly . . . distributed without authorization," *Rosen*, 487 F. Supp.

24

Redacted/Cleared for Public Release

2d at 708-09, as well as publicly available information designed to establish that the Transmitted Documents were not NDI.

The court's ruling constituted a total closure of a significant part of the trial. In this context, "a total closure involves excluding all persons from the courtroom for some period while a partial closure involves excluding one or more, but not all, individuals for some period." *United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015). By applying the SWR to all classified documents as well as all public source documents and testimony related to whether the classified documents contained NDI, the court effected a "a complete closure of the trial – because it prevent[ed] the public from seeing and hearing the complete body of evidence in the case." *United States v. Rosen*, 520 F. Supp. 2d 786, 797 (E.D. Va. 2007). Indeed, because the court's ruling "treat[ed] even certain related public domain documents ... as if they were classified documents," it was "clearly equivalent to sealing essential aspects of the trial." *Rosen*, 487 F. Supp. 2d at 715.

> b. The District Court Failed to Satisfy the Strict Standard to Support Excluding Publicly Available Documents From the Public Trial

The SWR is not automatically applied to classified documents, much less documents that are publicly available. The Classified Information Procedures Act (CIPA) provides the principal statutory framework for the handling of classified information in federal courts, and it states explicitly that "[w]ritings, recordings,

25

Redacted/Cleared for Public Release

and photographs containing classified information may be admitted into evidence without change in their classification status." CIPA § 8(a).

Nothing within the statute suggests that classified information admitted at a trial should be immune from the longstanding tradition and constitutional requirement of public criminal trials. On the contrary, "[a]lthough CIPA contemplates that the use of classified information be streamlined, courts must not be remiss in protecting a defendant's right to a full and meaningful presentation of his claim to innocence." *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990); *see also United States v. Abu Ali*, 528 F.3d 210, 255 (4th Cir. 2008) ("CIPA contemplates and authorizes district courts to prevent the disclosure of classified information, as was done in this case, so long as it does not deprive the defendant of a fair trial.").

Accordingly, "in order to prevent unnecessary disclosure of classified information involved in any criminal proceeding," CIPA provides that courts may admit redacted copies of documents containing classified information, § 8(b), and can fashion substitutions for classified information so long as the substitutions do not impair the defendant's ability to make his defense, § 6(c). But CIPA otherwise says nothing about the introduction of classified evidence by closing the courtroom to the public. *See Rosen*, 487 F. Supp.2d at 710 ("there is no evidence that Congress expected this creativity [in resolving issues related to classified ·

26

Redacted/Cleared for Public Release

information] to extend to adopting procedures that effectively close the trial to the public.").

Indeed, in the opinion where this Court first encountered a district court's use of the Silent Witness Rule with respect to certain classified documents, the trial court ruled that a classified document that was "[t]he centerpiece of th[e] case," would have to be admitted "in open court." *United States v. Zettl*, 835 F.2d 1059, 1063 (4th Cir. 1987). Accordingly, the fact that information in a document is classified is not, by itself, a sufficient reason to discard a defendant's right to a public trial.

In this case, however, the government's rationale for applying the SWR to publicly available documents was simply that if counsel were able to present such documents in open court, and ask witnesses about them, it would result in the disclosure of "classified facts." C.J.A. 215. The district court, reversing its pretrial ruling, agreed. C.J.A. 222-27.

Specifically, the court stated that "the use of the [public source] document[s] in open court ... would allow people to connect the dots and disclose classified information. So that's why we're using the silent witness rule." C.J.A. 233. It then instructed counsel that it could ask questions without publicly referencing the contents or details of the documents. C.J.A. 234. The court's ruling, moreover, sharply limited the amount of public source material that could be admitted, stating

27

Redacted/Cleared for Public Release

"I'm not having this jury spend hours looking at a public source document."
C.J.A. 223-27.

The district court failed to satisfy the rigorous standard required to completely close the courtroom to all evidence and testimony related to the contents of the transmitted documents as well as other publicly available documents. First, the district court's ruling failed to satisfy the first requirement, that an "overriding interest" exists that is "likely to be prejudiced" from the disclosure of publicly available documents in open court. "[A] generalized assertion of 'national security interests,' whether by virtue of the information's classified status or upon representation of counsel, is not alone sufficient to overcome the presumption in favor of open trials." *Rosen*, 487 F. Supp. 2d at 717. And, "[g]iven that the government [was] willing to trust its confidential information to jurors [and] alternates … it is difficult to credit fully the government's claim that the classified information at issue is deserving of rigorous protection." *Id.* at 718.

Furthermore, the interest in maintaining the secrecy of classified information is not "likely to be prejudiced" by reference to publicly available documents because the information in the public documents is, by definition, already publicly available. The court's rationale that the publicly available documents must be treated as if they were secret because they would tend to reveal information in

28

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

classified documents was thus upside-down. Publicly available documents in which the government has disclosed the same information as that claimed to be NDI in the classified documents demonstrate that there is no overriding interest in maintaining the secrecy of the classified documents themselves, because the information is already in the public domain and acknowledged by the government. Thus, the district court's ruling had it exactly backwards: it not only failed to provide justification for using the SWR for the publicly-available documents, but it also laid bare the weakness of any rationale for using the SWR for the Transmitted Documents.

The implications of the court's ruling are also vast, because under the court's ruling any publicly available document that is relevant and admissible with respect to the NDI element must be treated as deserving of secrecy, *because* it is relevant and admissible. Indeed, the court improperly started from the premise that classified documents and testimony about those documents should be excluded from the public trial, and based on that improper premise excluded relevant and admissible evidence from the public trial that is already in the public sphere.

Second, the district court's across-the-board application of the SWR to all classified documents and all documents in the public domain relevant to whether the classified documents contain NDI, without distinction between any of the documents, was far broader than necessary to protect against the disclosure of

29

Redacted/Cleared for Public Release

sensitive information. Indeed, the court made no effort to narrowly tailor its ruling. Instead, after suddenly reversing its pretrial ruling, it required defense counsel to make individual copies of its exhibits for each juror over a lunch break, and permitted only selected pages of publicly available documents to be admitted at the trial. U.J.A. 1023; C.J.A. 19-23.

Third, the district court failed to consider any alternatives to its blanket SWR ruling, such as redactions or treating individual documents differently depending upon the contents. Instead, after initially ruling that the defense would be permitted to use publicly available documents at the trial to challenge the "closely-held" and "would-cause-harm-if-disclosed" elements of the NDI definition, it reversed course in the middle of the trial, and substantially harmed the defendant's ability to present his defense.

Finally, the court made no "item-by-item description of the harm to national security that [would] result from disclosure at trial of each specific piece of information as to which closure is sought, as required by *Press-Enterprise*." *Rosen*, 487 F. Supp. 2d at 717. Instead, it simply agreed with the government that the admission in evidence and testimony in open court of publicly available documents would somehow disclose classified information. That reasoning is not enough to discard the defendant's ancient right to a public trial at which the evidence both against and for him is presented in open court.

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

In sum, the district court committed error in this case because the SWR was used categorically with respect to classified and publicly available documents alike, and the standard for closing the public trial was not met.

### C.    Application of the SWR Impeded Mr. Mallory's Right to Present a Defense

The district court's wholesale application of the SWR also violated Mr. Mallory's right to a meaningful opportunity to present a complete defense. Specifically, the district court's application of the SWR both impeded Mr. Mallory's ability to present his defense through cross-examination of the government's experts and direct examination of the defense's expert, and unmistakably communicated to the jury that the information in the Transmitted documents was so significant that even referring in open court to the same words in publicly-available government documents was forbidden.

"The right of the defendant to present evidence" is a fundamental component of a defendant's basic right to present a defense. *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).    Accordingly, the government's effort to both "simultaneously prosecut[e] the defendant and attempt[] to restrict his ability to use information that he feels is necessary to defend himself against the prosecution" because of the classified nature of the information implicates that basic right.    *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990).    In particular, the substitution of "vague, extremely abbreviated descriptions" in questioning during the "direct and

31

cross-examination of witnesses" – even if it involves reference to classified facts – can "severely compromise[]" a defendant's "constitutionally guaranteed ability to present a defense." *Id.* at 158.

Here, the SWR required counsel to use generalized language in open court based upon the idea that "the witnesses and the jury would [] consult [the classified and public source documents]" to understand the import of the questions and testimony. *Fernandez*, 913 F.2d at 162. In fact, this Court has previously affirmed the rejection of a similar proposal as too confusing, because it forces jurors "to make continuous reference [to other documents] while at the same time focusing on the content of the testimony." *Id.*

The Transmitted Documents containing classified information consist of two pages: one a handwritten "Table of Contents" which lists a target of intelligence collection and identifies⌐                                                                    ¬, and an undated one-page summary entitled "White Paper" – created by Mr. Mallory to look like a government document, but that is not – that consists of a general proposal for an intelligence operation with ⌐                                    ¬ using a general means of intelligence collection to obtain intelligence in several areas of interest. The government maintained that discussion of the contents of the transmitted documents would reveal a classified U.S. interest in the topics, as well

32

Redacted/Cleared for Public Release

as

U.J.A. 986; C.J.A. 218-20.

The defense sought to adduce evidence from a large number of publicly

available documents, primarily government-issued, that

U.J.A. 1011; C.J.A. 311-415. Yet because of

the blanket application of the Silent Witness Rule, the public testimony was

stripped of all of the contents and details in the Transmitted Documents and the

publicly available documents.

The indiscriminate use of the SWR thus prevented counsel from discussing

the similarities and differences between public source material and alleged NDI:

> [Q]uestions attempting to probe the similarity of putatively classified
> information and public domain information would require questions
> and answers in open court about the details and substance of the
> relevant public source documents and the alleged NDI. Yet, such
> questions and answers are precisely what the proposed procedure
> prohibits. At most, coded references would have to be used. But if a
> difference between the alleged NDI and public domain information is
> particularly elusive or difficult to describe, it would be impossible for
> defense counsel to demonstrate effectively via the silent witness rule
> that any differences between the alleged NDI and the public domain
> information do not support NDI status for the alleged NDI. Indeed,
> the code and unspoken comparisons required by the proposed
> procedure might well gloss over precisely the similarities and
> insignificance of differences in government-held information and
> public domain information that may be crucial to defendants' position.
> In short, the use of codes would render virtually impossible an
> effective line of cross-examination vital to the defense.

33

*Rosen*, 487 F. Supp.2d at 712. These observations were borne out in this case. In other words, "the silent witness rule, applied across the board as the government [successfully moved for] here, essentially rob[bed] [the] defendant[] of the chance to make vivid and drive home to the jury [his] view that the alleged NDI [was] no such thing, as essentially similar material was abundant in the public domain." *Id.* at 711.

Here, for example, is an excerpt of defense counsel's cross examination of a government expert based upon one such publicly-available document:

Q.   Please look at page 3. And again, I'm not asking you to read it out loud, but I'm going to ask you to review it to yourself. There's an entry, a little more than halfway down the page for a country you talked about on direct. Do you see that?
A.   I do.
Q.   Now I'd like you to read the first three sentences there.
A.   I have done so.
Q.   To yourself.
A.   I have done so.
Q.   It's fair to say the United States certainly acknowledges openly that it has an interest[] in those topics discussed there, right?
A.   Yes, it does.

U.J.A. 1046-47.

Likewise, here is a portion of the direct examination of the defense's expert:

Q.   Do you have 10C-4?
A.   Yes, sir, I do.
Q.   This appears to be a public document?
A.   Yes, sir.
Q.   Issued or held by a U.S. government agency?
A.   That's correct.

34

Redacted/Cleared for Public Release

- Q.    It's – if you can look at Section 7 at the bottom of the first page?
- A.    I see it.
- Q.    Does that also refer to the method of collection at issue in the White Paper, the Government's C9-3E1?
- A.    It does.

U.J.A. 1158.

In sum, the defense was precluded from discussing the contents of any publicly available document relevant to the NDI element in open court. In this manner, the cross-examination and public testimony were sterilized of specific details designed to establish that the Transmitted Documents contained only general information already widely available in public documents released by the government and former government officials.

Predictably, the government responded to the cross-examination of its expert by adducing testimony on redirect that "the publicly available information" did not have "the same information" or degree of "specificity and detail" as the Transmitted Documents. U.J.A. 1065-66. Yet because the district court prevented the defense from adducing testimony regarding the "specificity and detail" of the relevant documents, the district court's application of the SWR prevented the defense from effectively rebutting the government's claim, and thereby placed a heavy weight in favor of the prosecution. The district court's ruling thus did "not allow [the defendant] to point out in open court * * * * ([] point[s] central to his

35

Redacted/Cleared for Public Release

defense)." *Fernandez*, 913 F.2d at 162. It thereby violated his fundamental constitutional right to present evidence and testimony critical to the defense.

### D. The Court's Violation of Mr. Mallory's Right to a Public Trial and Right to Present His Defense Requires a New Trial

Whether or not the denial of the public trial right impacted the defense, there is no "require[ment] to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." *Waller v. Georgia,* 467 U.S. 39, 49 (1984). "While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real." *Id.* at 49 n.9.

Consequently, a violation of the right to a public trial is considered "structural," and "where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017). The denial of the right to a public trial in this case requires this Court to vacate all counts of conviction, regardless of any actual prejudice from the error.

Moreover, as described above, the district court's application of the SWR violated Mr. Mallory's "right to a full and meaningful presentation of his claim to innocence." *Fernandez*, 913 F.2d at 154. As such, the denial of the right to a

36

Redacted/Cleared for Public Release

meaningful opportunity to present a defense constitutes an independent basis

requiring the Court to vacate the convictions and remand for a new trial.

II.    THE DISTRICT COURT ERRED IN INSTRUCTING THE JURY
        AS TO THE MENS REA ELEMENT OF 18 U.S.C. § 794

A.    Standard of Review

The Court "conduct[s] a de novo review of any claim that jury instructions

incorrectly stated the law." *United States v. Mouzone*, 687 F.3d 207, 217 (4th Cir.

2012); *accord United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996) (whether a

trial court properly defines an element of an offense is reviewed de novo).

B.    The District Court Applied a Negligence Standard to the
        "Delimiting" Clause of § 794(a), and Lowered the Subjective
        Intent Standard to "Wilfullness"

Federal crimes almost universally require proof of subjective intent, and 18

U.S.C. § 794(a) is no exception. The statute provides: "Whoever, *with intent or*

*reason to believe that it is to be used to the injury of the United States or to the*

*advantage of a foreign nation*, communicates, delivers, or transmits, ... to any

foreign government ... information relating to the national defense, shall be

punished by death or by imprisonment for any term of years or for life ...."

§ 794(a) (emphasis added).[6]    In its leading decision addressing another espionage

offense with the same mens rea element, the Supreme Court explained that:

_____

[6] Conspiracy to commit espionage in violation of § 794(c) requires the same
degree of criminal intent as the substantive offense. *See Truong Dinh Hung*, 629

37

Redacted/Cleared for Public Release

> The obvious delimiting words in the statute are those requiring 'intent
> or reason to believe that the information to be obtained is to be used to
> the injury of the United States, or to the advantage of any foreign
> nation.' This requires those prosecuted to have acted in bad faith.
> The sanctions apply only when scienter is established.

*Gorin v. United States*, 312 U.S. 19, 27-28 (1941). This Court has described

§ 794(a)'s "scienter requirement" as "critically important" to the Supreme Court's

conclusion that the espionage statute was not unconstitutionally overbroad. *United*

*States v. Truong Dinh Hung*, 629 F.2d 908, 918 (4th Cir. 1980). It has also noted

that § 794 "is a far more serious offense" than that described by § 793(e), *United*

*States v. Morison*, 844 F.2d 1057, 1065 (4th Cir. 1988), which "does not contain

the same strong scienter language of § 794(a)," and requires only "that the accused

'willfully' transmit the information.'" *Truong Dinh Hung*, 629 F.2d at 919.

> 1. Section 794's Intent Element Requires Proof of Sub-
> jective Intent or Reason to Believe That Disclosure Will
> Harm the United States or Will Be Used to the
> Advantage of a Foreign Nation

*Gorin* establishes that under § 794(a), "a defendant must be 'blameworthy in

mind' before he can be found guilty, a concept courts have expressed over time

through various terms such as mens rea, scienter, malice aforethought, guilty

knowledge, and the like." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015).

"Scienter" connotes a blameworthy mental state, and cannot be established by

F.2d at 918; U.J.A. 1465 (jury instruction); *see also Ingram v. United States*, 360
U.S. 672, 678 (1959) (noting that conspiracy to commit substantive offense
requires same intent).

38

mere negligence. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 &

n.12, 212-14 (1976) (holding claim for civil damages under Securities Exchange

Act § 10(b) required allegation of scienter, not negligence); *Cozzarelli v. Inspire

Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008) ("To prove the necessary mental

state of scienter, negligence is not enough."). Indeed, "[t]he existence of a scienter

requirement is customarily an important element in distinguishing criminal from

civil statutes." *Kansas v. Hendricks*, 117 S. Ct. 2072, 2082 (1997).

In § 794(a), the plain text of the scienter requirement requires proof that the

defendant subjectively intended that disclosed information is to be used to harm

the United States or aid a foreign country, or that the defendant – not a

hypothetical reasonable person – had reason to believe that disclosed information

is to be used to harm the United States or aid a foreign nation.[7]  Put differently,

---

[7] Decisions construing similar mens rea provisions likewise conclude that
such language requires proof of a defendant's subjective intent. *See United States
v. Saffo*, 227 F.3d 1260, 1268-69 (10th Cir. 2000) ("[t]he scienter standard of
'knowing or having reasonable cause to believe' . . . . involves a subjective
inquiry" that "requires scienter to be evaluated through the lens of this particular
defendant, rather than from the prospective of a hypothetical reasonable man.");
*see also United States v. Smith*, 960 F.3d 883, 890 (6th Cir. 2020) ("Federal and
Ohio courts have consistently held that 'reasonable cause to believe' is a type of
actual knowledge"); *United States v. Featherston*, 461 F.2d 1119, 1122 (5th Cir.
1972) (similar language in 18 U.S.C. § 231(a) "requires those prosecuted to have
acted with intent or knowledge that the information disseminated would be used in
the furtherance of a civil disorder."); *United States v. Iron Eyes*, 367 F.3d 781, 784
(8th Cir. 2004) (similar language in 18 U.S.C. § 922(j) "requires proof that a
defendant possessed a gun that it would have been reasonable for him or her, in
particular, to believe was stolen."); *United States v. Munguia*, 704 F.3d 596, 603

39

Redacted/Cleared for Public Release

culpability under § 794 depends upon proof that the defendant himself acted with the intention or with reason to believe that the information he disclosed is to be used to harm the United States or aid a foreign nation. What a hypothetical reasonable person in the defendant's position would have concluded is immaterial.

### 2. The District Court Charged the Jury That the "Reason to Believe" Element Could Be Established Based Upon a Reasonable Person Standard

In this case, however, the district court charged the jury that "[i]n determining whether a defendant has 'reason to believe,' the question is whether *a reasonable person in the defendant's position* would have reached the same conclusion." U.J.A. 1459 (emphasis added). According to the court's instruction, "a defendant has reason to believe if the defendant knows facts from which he concluded or *reasonably should have concluded* that information related to the national defense was to be used for prohibited purposes." *Id.* (emphasis added).

"Such a 'reasonable person' standard is a familiar feature of civil liability in tort law, but is inconsistent with 'the conventional requirement for criminal conduct – awareness of some wrongdoing.'" *Elonis*, 135 S. Ct. at 2011 (quoting *Staples v. United States*, 511 U.S. 600, 606-07 (1994)). Accordingly, "[h]aving liability turn on whether a 'reasonable person' regards the communication as [to be

_____

(9th Cir. 2012) ("The scienter requirement of § 841(c)(2) is not satisfied if some hypothetical person would have had 'reasonable cause to believe' that cold pills would be used to make methamphetamine.").

40

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

used for prohibited purposes] – regardless of what the defendant thinks – 'reduces culpability on the all-important element of the crime to negligence.'" *Id.* (citation omitted). Likewise, "[t]he formulation 'should have known' reflects negligence ...." *BMG Rights Mgmt. (US) LLC v. Cox Comm., Inc.*, 881 F.3d 293, 310 (4th Cir. 2018). Evidence of what "the defendant *should have known*" thus does not satisfy the "subjective standard" of knowledge. 3 W. Lafave, Subst. Crim. L. § 21.2(c) (3d ed. 2018) (emphasis added).

> 3. The District Court's Addition of a "Willfulness" Element, and Denying That the Reasonable Person Standard Is Equivalent to Negligence, Does Not Cure the Error

In denying Mr. Mallory's post-trial motion for a new trial on this ground, the district court conceded that the instructions "charged the jury that '[i]n determining whether a defendant has 'reason to believe,' the question is whether a reasonable person in the defendant's position would have reached the same conclusion.'" U.J.A. 1808. Nonetheless, it concluded that "in the context of the entire instruction, the directive to consider 'whether a reasonable person in the defendant's position would have reached the same conclusion [as defendant's conclusion]' merely served to assist the jury in determining what defendant himself reasonably should have concluded." U.J.A. 1809.

In its post-trial opinion, the district court noted that the jury was also instructed that: (1) the "reason to believe" element "does not mean that the

41

Redacted/Cleared for Public Release

defendant acted negligently;" U.J.A. 1459, 1809; and (2) the government had to prove "that the defendant acted *willfully* in communicating, delivering, [or] transmitting information related to the national defense, U.J.A. 1459 (emphasis added). As such, according to the district court, "[t]he instructions in this case were essentially the same as those approved by the Fourth Circuit in *Truong* ...." U.J.A. 1809-10. Taken as a whole, however, the district court's instructions lowered the mens rea element required to convict under § 794.

First, the court's statement in its instruction to the jury that the "reasonable person" standard was not equivalent to negligence, U.J.A. 1459, and its conclusion in its opinion that the instruction "merely served to assist the jury in determining what defendant himself reasonably should have concluded," U.J.A. 1809, is not an accurate characterization of the instruction. In rejecting a similar argument made by the government in *Elonis*, the Supreme Court noted that "[c]riminal negligence standards often incorporate 'the circumstances known' to a defendant. Courts then ask, however, whether a reasonable person equipped with that knowledge, not the actual defendant, would have recognized the harmfulness of his conduct." 135 S. Ct. at 2011. The district court's observation that the jury was to consider "the facts that defendant himself, subjectively, knew," 343 F.Supp. 3d at 575, does not alter the fact that deciding what a "reasonable person" in the defendant's position should have concluded "is a negligence standard." 135 S. Ct. at 2011. Indeed,

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

simply requiring proof of what the defendant "'*should* have known' reflects negligence and is therefore too low a standard." *BMG Rights Mgmt.*, 881 F.3d at 310 (emphasis added).

Second, replacing the "strong scienter language of § 794(a)" with a "willfulness" element does not obviate the error. The word "willfully" does not appear in § 794(a), and instead is an element in § 793(d) and § 793(e). But "[§] 794 is a far more serious offense than section 793(d)" and (e). *Morison*, 844 F.2d at 1065. Furthermore, as this Court has explained, "[§] 793(e) does not contain the same strong scienter language of s 794(a)," but "it does require that the accused 'willfully' transmit the information." *Truong Dinh Hung*, 629 F.2d at 919. That is how the district court instructed the jury in this case – not that the government must prove Mr. Mallory willfully transmitted information he intended or had reason to believe was to be used to harm the United States or aid a foreign country – but that he willfully transmitted NDI. U.J.A. 1459.

"'Willfulness,' in the context of § 793(e), arises not in the context of bad intent, but in the conscious choice to communicate covered information." *United States v. Diaz*, 69 M.J. 127, 132 (C.A.A.F. 2010). As such, courts construing § 793(d) and (e) generally conclude that those statutes impose no "burden on the government to prove that the defendant intended to injure the United States or to aid a foreign government," even though the statutes require proof that the

43

Redacted/Cleared for Public Release

defendant "willfully" transmitted the information at issue. *See, e.g., United States v. Kiriakou*, 898 F. Supp. 2d 921, 926 (E.D. Va. 2012). Willfully transmitting national defense information, in other words, is a lesser standard of intent than transmitting such information with the intention or reason to believe the information will be used to harm the United States or aid a foreign country.

In this case, the district court instructed the jury that the government had to prove that Mr. Mallory "willfully" conspired to transmit NDI, but that it need only conclude that a "reasonable person" should have concluded that the information was to be used to harm the United States or aid a foreign nation. These instructions are thus unlike those at issue in *Truong* in a crucial respect, as the district court in that case "did not instruct the jury to consider whether a reasonable person in defendant's position would have reached the same conclusion as [the] defendant." *See Mallory*, 343 F. Supp. 3d 570, 577 n.9 (E.D. Va. 2018). In sum, on the critical distinction between scienter and negligence with respect to whether the information at issue would be used to harm the United States or aid a foreign nation, the instructions in this case departed from the text of § 794, and lowered the standard of intent required to establish guilt.

44

Redacted/Cleared for Public Release

C.    The Court Must Vacate the Conviction on Count 1 and Remand
      for a New Trial

The crux of the defense at trial was that Mr. Mallory did not transmit NDI,

and that even if it was NDI, what he transmitted to a Chinese agent was so

innocuous that it was not sent with an intention or reason to believe that the

information was to be used to harm the United States or aid China. But "the jury

instructions at issue simply failed to convey the requisite consciousness of

wrongdoing." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 706 (2005).

Because the district court's instructions lowered the standard of intent

required by 18 U.S.C. § 794(a), the Court must vacate the conviction and require a

new trial as to Count 1. *See United States v. Hassouneh*, 199 F.3d 175, 182 (4th

Cir. 2000) (vacating conviction and remanding for new trial because of court's

erroneous instruction as to mens rea); *United States v. Varner*, 748 F.2d 925, 927

(4th Cir. 1984) (vacating conviction and remanding for new trial because of

incorrect instruction regarding witness credibility); *United States v. Gresko*, 632

F.2d 1128, 1135 (4th Cir. 1980) (vacating and remanding for new trial based upon

erroneous jury instruction as to offense element). Indeed, in the context of the

espionage statutes, the failure to properly instruct the jury regarding the key

element of intent warrants a new trial even if the Court finds that the government

presented substantial evidence of guilt. *See United States v. Richardson*, 33 M.J.

127, 130 (C.M.A. 1991) (vacating espionage conviction notwithstanding

45

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

"overwhelming factual case" because of trial court's failure to properly instruct jury as to intent element).

III. THE DISTRICT COURT ERRED BY REFUSING TO INSTRUCT THE JURY AS TO THE DEFENSE'S THEORY OF DEFENSE INSTRUCTION THAT EVIDENCE OF SELLING AND BUYING CONTRABAND IS NOT SUFFICIENT TO ESTABLISH A CRIMINAL CONSPIRACY

A.  Standard of Review

Although this Court ordinarily reviews the refusal to give a proffered instruction under an abuse of discretion standard, *United States v. Savage*, 885 F.3d 212, 222 (4th Cir. 2018), "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988).  A district court's refusal to instruct the jury on such a defense presents a question of law that is reviewed de novo.  *United States v. Ricks*, 573 F.3d 198, 200 (4th Cir. 2009) ("A district court's refusal to instruct the jury on [a recognized defense for which there exists sufficient evidence] presents a question of law that we review de novo."). Accordingly, the district court's refusal to instruct the jury as to the buyer-seller defense to conspiracy is reviewed de novo.  *See United States v. Lomax*, 816 F.3d 468, 475-76 (7th Cir. 2016) (holding that district court's refusal to instruct on buyer-seller defense is "reviewed de novo" because the question before the court is the "legal sufficiency of a proffered defense").

46

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

B.  Based Upon the Evidence Introduced at Trial, the District Court Erred in Refusing to Instruct the Jury That Evidence of a Buyer-Seller Relationship Is Insufficient to Establish a Conspiracy

As a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). A defendant is entitled to an instruction on his theory of defense "[a]s long as the instructions have an evidentiary foundation and are accurate statements of the law." *United States v. Dornhofer*, 859 F.2d 1195, 1199 (4th Cir. 1988). If those criteria are satisfied, a defense theory instruction may not be denied unless other instructions specifically covered the same ground. *United States v. Miller*, 658 F.2d 235, 237-38 (4th Cir. 1981); *United States v. Mitchell*, 495 F.2d 285, 288 (4th Cir. 1974) ("oblique references" to the defense theory in other instructions are insufficient; rather, the defendant should have received "the precise and specific charge to which he was entitled"). As this Court explained in *Miller*, general instructions about the elements of an offense that could independently support a defense argument are "quite different from explaining to the jury how the defendant can legitimately counter the government's proof of the essential element" in a manner "sufficiently precise to instruct the jury" on the defendant's theory. 658 F.2d at 237-38 (internal quotations and citation omitted).

47

Redacted/Cleared for Public Release

Conspirators are partners who have agreed upon a common criminal goal. *Salinas v. United States*, 522 U.S. 52, 63-64 (1997) (in a conspiracy, "[t]he partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other); *United States v. Kissel*, 218 U.S. 601, 608 (1910) ("A conspiracy is a partnership in criminal purposes."). But the common goal must extend beyond an agreement merely to transfer contraband in an arms-length transaction. *See United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993) (en banc).

In other words, "[a] mere buyer-seller relationship is insufficient to support a conspiracy conviction." *United States v. Howard*, 773 F.3d 519, 525 (4th Cir. 2014). While this defense is raised most often in drug cases, it applies in other contexts as well. *See United States v. Gee*, 226 F.3d 885, 893-96 (7th Cir. 2000) (reversing on plain error review for failure to give buyer-seller instruction in case involving unlawful distribution of television descrambler boxes designed to receive cable television signals without authorization).

The rationale is simple: to constitute a separate crime from the substantive object of the offense, a conspiracy conviction must rest upon more than simply the transactions prohibited by the substantive offense. Repeatedly buying hamburgers from McDonalds, for example, does not establish a conspiracy to sell hamburgers between a fast-food restaurant and a buyer. Instead, the buyer and the franchise

48

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

are each pursuing their own objectives at arms' length, with no agreement beyond the transactions themselves. If selling and buying hamburgers were crimes, each could be prosecuted and convicted for committing a substantive offense (one for selling, one for buying), but not for conspiring. *See United States v. Brown*, 726 F.3d 993, 999 (7th Cir. 2013) (providing example that buyers at Wal-Mart, even if they engage in frequent, regular, standard purchases, "do not evince the substantial relationship entailed in a conspiracy"). In other words, "[u]nder this rule, notwith-standing that a seller and a buyer agree together that they will cooperate to accomplish an illegal transfer [], the objective to transfer the [contraband] from the seller to the buyer cannot serve as the basis for a charge of conspiracy to transfer [contraband]." *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009).

In this case, the district court instructed the jury that it could find the defendant guilty "[i]f the evidence establishes beyond a reasonable doubt that the defendant knowingly and deliberately entered into an agreement to communicate, deliver, or transmit information relating to the national defense to a foreign government." U.J.A. 1464. The instruction thus authorized a conviction for conspiracy based merely upon Mr. Mallory's agreement with a recipient to transfer NDI to the recipient. As such, the court's instructions did not make clear that an agreement between a seller and a buyer alone to transmit information was insuffic-ient to establish a conspiracy. *See* U.J.A. 1461-65.

49

Redacted/Cleared for Public Release

Moreover, there was ample evidence that Mr. Mallory and the Chinese agent, Michael Yang, were not partners, shared no common criminal objective beyond the transmission of the Transmitted Documents, and that there was no agreement beyond the transfer of that information itself. Most importantly, the evidence established that Mr. Mallory repeatedly sought to provide information to the CIA about his contacts with the Chinese agents, and turned over the cell phone with the custom application to the FBI along with instructions about how to use the application. Without Mr. Mallory's assistance, it would have been much more difficult if not impossible for the FBI to access the information in the custom application. U.J.A. 359-63. At the same time, there was no evidence that Mr. Mallory ever told the Chinese about providing information to the CIA or the FBI. *Cf. United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011) ("a government agent, despite his unauthorized purchases [of drugs for personal use], [] cannot be a co-conspirator"); *United States v. Lewis*, 53 F.3d 29, 33 (4th Cir. 1995) (a "defendant cannot be convicted for conspiring with a government agent").

Furthermore, there was no evidence of either an ideological alignment or an ongoing relationship based on "mutual trust" that is necessary to distinguish a conspiracy from an arms-length buyer-seller relationship. *Gee*, 226 F.3d at 894. Instead, the evidence established only that on one occasion, May 1, 2017, Mr. Mallory sent the Transmitted Documents while he concurrently sought to meet

50

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

with CIA and FBI agents to provide information about his contacts with the Chinese. There was no mutually-agreed price for the Transmitted Documents (or any others), and no regular course of conduct. Finally, the government's own evidence demonstrated that the relationship was devoid of reciprocal confidence, and instead was based upon false statements and attempts by each to manipulate the other – rather than an established joint venture grounded in "mutual trust." U.J.A. 1016-18 (government expert describing Chinese agent as seeking to "manipulate" Mr. Mallory with the single goal of "getting as much and the best quality information [he] can"); U.J.A. 812-19 (describing Mr. Mallory's multiple misrepresentations to Chinese agent). As such, even viewing the evidence in the light most favorable to the government, there was no "separate criminal object" proven at trial beyond the delivery of the Transmitted Documents to Michael Yang.

That fact that the recipient of the Transmitted Documents further distributed the Transmitted Documents within the Chinese intelligence community is immaterial. Such further distribution is not a "separate criminal object" of the conspiracy, as it constitutes the same communication of the alleged NDI "to" a foreign country established by the alleged conspiracy to transmit the documents in the first place. 18 U.S.C. § 794(a). In other words, transfer of the information within China is not a distinct violation of § 794(a). Furthermore, nothing supports

51

Redacted/Cleared for Public Release

the inference that Mr. Malloy had a "direct stake" in the further distribution of the information within China. As such, that cannot constitute the "separate criminal object" of the charged conspiracy. *See United States v. Thomas*, 284 F.3d 746, 754 (7th Cir. 2002) (vacating conspiracy conviction because evidence did "not reflect [] a shared stake [of the seller] in the success of [the buyer's] distribution enterprise").

Under these circumstances, the failure to give the requested buyer-seller instruction constitutes reversible error as to Count One. *See Gee*, 226 F.3d at 894- 95 (reversing conviction for failure to give buyer-seller instruction where evidence supported defense); *see also United States v. Prieskorn*, 658 F.2d 631, 636 (8th Cir. 1981) (failure to give buyer-seller instruction reversible even where sufficient evidence of conspiracy was adduced because "we cannot say that a reasonable person might not conclude that the evidence supported appellant's requested buyer-seller instruction"); *United States v. Harris*, 65 F.3d 177, 1995 WL 497915 at *4-5 (9th Cir. Aug. 16, 1995) (reversing for failure to give buyer-seller instruction because the facts "left open the possibility [of] merely a buyer-seller relationship"); *United States v. Thomas*, 150 F.3d 743, 745 (7th Cir. 1998) (finding plain error and reversing for failure to give buyer-seller instruction).

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

## CONCLUSION

For the reasons set forth above, Kevin Mallory respectfully asks this Court

to vacate his convictions and remand the case for a new trial.

Respectfully submitted,

GEREMY C. KAMENS
Federal Public Defender
for the Eastern District of Virginia

Geremy C. Kamens (by FHP)

Geremy C. Kamens
Federal Public Defender
Frances H. Pratt
Todd M. Richman
Assistant Federal Public Defenders
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Geremy_Kamens@fd.org
Fran_Pratt@fd.org
Todd_Richman@fd.org

Dated July 30, 2020

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

## REQUEST FOR ORAL ARGUMENT

This case presents the novel question of whether publicly available information can be excluded from a public trial because of concerns regarding the disclosure of sensitive information, as well as important issues regarding the elements of the offense of conspiring to commit espionage. For these reasons, the issues raised in this brief warrant oral argument, and counsel respectfully requests the same.

54

Redacted/Cleared for Public Release

Redacted/Cleared for Public Release

## CERTIFICATE OF COMPLIANCE

1.  This Opening Brief has been prepared using Microsoft Word 2016 software, Times New Roman font, 14-point proportional type size.

2.  EXCLUSIVE of the corporate disclosure statement, table of contents, table of authorities, statement with respect to oral argument, any addendum containing statutes, rules, or regulations, and the certificate of service, this brief contains no more than 13,000 words, specifically 12,655 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

<table>
<tr><td>July 30, 2020</td><td>Frances H. Pratt</td></tr>
<tr><td>Date</td><td>Frances H. Pratt<br>Assistant Federal Public Defender</td></tr>
</table>

Redacted/Cleared for Public Release